In the Matter of NATHAN GORDON, an Attorney, Respondent.

First Department, April 11, 1930.

*Isidor J. Kresel* of counsel [*Kenneth O'Brien* with him on the brief], for the petitioners.

*Harris Jay Griston,* for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, First Department, on May 13, 1907.

The petition charges respondent with misconduct as an attorney at law as follows:

1. On or about June 3, 1924, Caroline Zippert, an infant, sustained injuries in an accident, and her mother, Helen Zippert, retained the respondent as attorney for herself and for the infant. The respondent commenced an action in behalf of the infant and also an action on behalf of the mother against Camille Levy. A settlement for the infant in the sum of $400, and for the mother for $200, was effected about March 6, 1926, and the insurer for the defendant, Globe Indemnity Company, delivered two checks, one for $400 and one for $200, respectively, to the respondent, who indorsed the name of Helen Zippert on each check without her knowledge or authority, and collected the proceeds. About February 1, 1926, the respondent applied to the court for an order fixing his compensation for the services rendered in the infant's case and on March 1, 1926, an order was entered directing that the respondent's fee for the services which he rendered to the infant be fixed at $150. The respondent did not remit the money collected on behalf of Helen Zippert and Caroline Zippert until November 23, 1926, in the meantime converting the same to his own use. He retained the sum of $200 in the infant's case, instead of $150;

and on November 23, 1926, he accounted for $350 of the money collected by him for the infant and converted the rest to his own use, namely $50.

2. About December 31, 1926, Rose Kaufman, an infant, was injured and her mother, Lillie Kaufman, retained the respondent as attorney, who thereupon commenced an action on behalf of the infant against the Shapiro Candy Company in the City Court, Bronx county. Thereafter the respondent settled the matter with the Ocean Accident and Guarantee Corporation, the insurer for the defendant, for $100, which was received by the respondent about May 27, 1927. Around May 26, 1927, the respondent applied to the court for an order fixing his compensation, and on the same day an order was entered fixing the respondent's fee at thirty-five dollars. The respondent violated the terms of the order and instead of thirty-five dollars retained fifty dollars of the money collected by him on behalf of the infant. He thereupon accounted for eighty-five dollars and converted to his own use the balance, namely, fifteen dollars.

Respondent answered and the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion thereon to this court. The learned referee has duly reported and the petitioners move for such action as the court may deem proper.

Disposing of the second charge first: It appears that, as alleged in the petition, Rose Kaufman was injured on December 31, 1926, in an automobile accident. On the recommendation of her employer, Lillie Kaufman, the mother of Rose Kaufman, retained respondent. Actions were brought in the City Court of the City of New York, Bronx county. The insurer of the defendant settled the infant's claim for one hundred dollars, and the parent's claim for one hundred and fifty dollars. The order allowing compromise of the infant's claim fixed respondent's compensation at thirty-five dollars. Under his retainer with the parent, he was entitled to one-half of the settlement, or seventy-five dollars. Respondent testified that he had paid thirty dollars for his investigation of the case, and had paid one dollar and fifty cents for the service of a summons, and twenty-five cents for a certified copy of the order, making his total disbursements thirty-one dollars and seventy-five cents; that when Mrs. Kaufman came to his office after the check, he said, "Mrs. Kaufman, here is the situation: All I was allowed was $35 in this particular case, and my expenses were over $31. I had $30 expense in investigating your case. It would not be fair that I should assume the responsibility of the entire payment of this investigation.' I said, 'You stand half and I will stand

half.' And she said, ' All right. Let it go at that.' And that is why I gave her $125. She knew I charged her $15 and charged $15 to myself, but to take out the entire $31.75 out of this settlement I said would not be fair to me."

The following is an extract from Mrs. Kaufman's cross-examination: " Q. Did Mr. Gordon tell you that it cost him $30 to investigate the case and for expenses? A. Yes, he told me that. Q. And did you agree to pay half of that? A. Yes. Q. Do you know that the Court order marked Exhibit 10 allowed Mr. Gordon $35 out of the $100 awarded to your daughter? He was supposed to get $35 and your daughter $65? A. Yes. Q. And that out of the $150 that was allowed to you he was supposed to get $75 and you $75. Did you agree to deduct half of those expenses, half of the $30 from your allowance out of the $150? A. Yes. Q. So that you received $60 in your case and $65 in your daughter's case? A. Yes."

It appears that respondent received the settlement check from the insurer about May 27, 1927. Payment was not made to the Kaufmans until August 20, 1927. Mrs. Kaufman testified that after signing the release, which is dated May 27, 1927, she called respondent on the telephone and asked him if he had heard anything about the case, and respondent said as soon as he was ready to settle he would call her up. That he did call her up in a couple of weeks and she went down the same day. Respondent's story is that he got in touch with Rose Kaufman twice on the telephone and wrote her a letter, and finally called the mother to come for the check.

The referee states in his report: " While in my judgment there is not sufficient evidence to sustain the charge that respondent converted to his own use the sum of $15.00, I am of the opinion that respondent violated his obligations and duties as a member of the Bar in retaining his client's money for a period of three months, and that he had failed to give a satisfactory explanation for this delay." This conclusion we find justified upon the record.

On the first charge, the record discloses that on June 3, 1924, Caroline Zippert, an infant, was injured in an automobile accident. Her mother, Helen Zippert, retained respondent to prosecute their respective claims. Two actions were instituted in the Supreme Court, Queens county, against Camille Levy. The insurer of the defendant settled the actions, $400 for the infant, and $200 for the parent. March 1, 1926, an order was obtained granting leave to compromise the infant's claim, and fixing respondent's compensation at $150, " for services rendered and disbursements." The checks from the insurance company, one for $200 to the order of

" Nathan Gordon, attorney, and Helen Zippert," and the other for $400 to the order of " Nathan Gordon, attorney, and Helen Zippert, individually and as guardian *ad litem* of Caroline Zippert, an infant," are dated March 6, 1926. The bank indorsement shows they were paid on March 9, 1926. It appears that when they were received by respondent they were cashed by his office associate. Payment was not made to Mrs. Zippert until November 23, 1926, when respondent delivered to her a check for $300, but, Mrs. Zippert testified, he told her not to deposit it until he told her to do so. This check shows that it was deposited in the Bank of the Manhattan Company on December 21, 1926, and paid in due course. The testimony is that respondent called her up and told her to deposit it. It further appears from Mrs. Zippert's testimony that from March to November she went to respondent's office a number of times looking for the money, and when she could do nothing she sent her brother. Mrs. Zippert's brother, Irving Klein, testified to calls he made upon respondent at a time which he fixed about Labor Day, 1926; during the first call, respondent told him the case had not yet been settled; then Klein called on the insurance company, and after some effort, secured the information that the case had been settled; thereafter he called again on respondent, who spoke of the necessity of a bond in the infant's case, and that that was causing the delay.

Respondent's story is that when Mrs. Zippert signed the releases he told her to call him up in a week or two and he would let her know if her money would be ready. After a month had passed by and she had not shown up he asked his secretary to call her up; the secretary informed him that she had been in touch with Mrs. Zippert and Mrs. Zippert said she would call as soon as she could; that he did not mail a check to her because he expected her to call any day, and there was the matter of disbursements to be considered, generally a matter of negotiation between attorney and client, in such actions; then, in May, his office was remodeled, and his secretary, who had been with him ten or twelve years, left, and Mrs. Zippert slipped from his mind entirely. In the middle of November, Mrs. Zippert called him up; he reprimanded her for not having called sooner, and she said she was not worried, and would call that week or the next; and on November twenty-third she called, and dickered about the disbursements, and agreed that she was to get a flat $300, and respondent gave her check for that amount. Respondent's secretary at the time, who had left respondent's employ in May, 1926, testified to calling Mrs. Zippert on the telephone and telling her to call for the money.

Respondent explains the payment of $300 to Mrs. Zippert as

follows: " From the $200 it was understood that I was to have 50 per cent on the loss of services, $100; for the $150 which Judge GIBBS allowed me for my services and $75 about all told for expenses and disbursements; even the payment of the bond, which she should have paid, and that made it $325. Therefore, from this $600 she was entitled to about $275. She turned around and said, ' Well, I thought it was fifty fifty. So I ought to get $300,' I said, ' I understand what you mean very well. I will tell you what I will do. I think I kept your money long enough; it was not my fault; but I will give you $300.' "

Respondent attempts to account for his indorsement of the checks for the settlements received from the insurance company by the statement that he had the written authorization of Mrs. Zippert to indorse the same. The written authorization was never produced. Mrs. Zippert testified that she had authorized no one to indorse any checks for her. The learned referee has found that the indorsement of the name " Helen Zippert " on the two checks in question was written in such a manner as to give the impression that said indorsement was written in a feminine handwriting, or at least by a person other than the person who wrote the remaining part of the indorsement; and that respondent's explanation that he indorsed the name " Helen Zippert " some time after he had written the remaining part of the indorsement and in a cramped space and possibly with another pen, is unconvincing. With these conclusions we also agree.

An examination of a transcript of respondent's bank account, covering the period from the time he received the checks from the insurance company to the date of payment of the check he delivered to Mrs. Zippert, shows there were many days when the balance was insufficient to meet the amount coming to his client out of the settlement. There were occasions when this condition of his bank account continued from three to five days at a time.

The referee's report states: " I have reached the conclusion that respondent indorsed the name of his client Helen Zippert, to petitioner's Exhibits 4 and 5 [the checks], without her knowledge or consent, and without any right or authority."

Further, " Respondent admits that from March 6th, 1926, when he received the checks from the insurance company until November 23rd, 1926, when he gave Mrs. Zippert a check for $300.00 the proceeds of these checks were deposited in his personal account and were commingled with his own funds. Respondent further admits that at various times during that period his daily balances were less than $300.00. By his own admissions, therefore, respondent converted the funds of his clients to his own use during that period."

The referee, in view of the fact that the order allowing compromise also allowed respondent disbursements, and respondent has accounted for disbursements amounting to at least fifty dollars, concluded that the charge of conversion of fifty dollars of the infant's moneys was not sustained.

We agree with these further conclusions of the learned referee.

The charges against the respondent herein are a result of an investigation conducted in connection with the ambulance chasing investigation. No complaint against respondent had been made by either of the clients in the transactions here reviewed. The payments made by respondent to these clients were not made through fear of complaint to any of the bar associations, but were made long before the ambulance chasing investigation. Respondent has been a member of the bar for nearly a quarter of a century, and, so far as appears, no other complaint has ever been made against him.

We cannot, however, condone his indorsement of his client's name to the two checks without authority from her so to do, nor his retention of the moneys belonging to both these clients for an unreasonable time, even though he made restitution before complaint was made to the Association of the Bar. The respondent should be suspended from practice for the period of one year, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent suspended for one year.